## GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v. J. R. NORTON.

### Decided April 28, 1909.

**1.—Derailment of Train—Act of Trespasser—Evidence.**

Where, in an action against a railway company for damages for personal injuries caused by the derailment of defendant's train, the defendant plead that the derailment was caused by the malicious act of third parties, evidence considered, and held insufficient to require the trial court to submit said issue to the jury.

**2.—Same—Evidence—Admission of Agent.**

The issue being whether or not a railroad track at a certain point was in a safe condition for the operation of passenger trains thereon, it was proper to permit a witness to testify that on the evening before the wreck occurred at said point on the following morning, a third party, not in the employ of the defendant, said to defendant's section foreman then at work on the track, that he would have a serious wreck "if he didn't spike up those ties;" and

the answer of the foreman that "that was the way he had instructions to spike them;" the foreman having previously testified that the track was in a safe condition, and a proper predicate having been laid for said discrediting testimony.

**3.—Carrier of Passengers—Degree of Care—Charge.**

Charge upon the degree of care required of carriers of passengers, considered and approved.

Appeal from the District Court of Bexar County. Tried below before Hon. A. W. Seeligson.

*Baker, Botts, Parker & Garwood, D. C. Bolinger* and *W. F. Ezell,* for appellant.—The issue that the wreck of the passenger train on which appellee claims he was injured was caused by malicious acts of trespassers, committed in the night-time a short time before the wreck, and that such malicious act could not have been discovered or prevented by appellant by the exercise of the highest degree of care on its part, and that appellant was not negligent in failing to discover such trespass, was clearly raised and presented in this cause as a defense by appellant, both by its pleadings and by the evidence, and the court committed palpable error in refusing, upon request made by appellant, to submit such issue as a defense in this cause. Heatherly v. Little, 40 S. W., 445; Diamond Mill Co. v. G. Nat'l Bank, 29 S. W., 169; Whitsitt v. Miller, 1 Posey U. C., 212; Waul v. Hardie, 17 Texas, 558; Richards v. Minster, 70 S. W., 98; Railway v. Carstens, 47 S. W., 36; Fox v. Brady, 20 S. W., 1024.

The court erred in permitting the plaintiff's witness, C. C. Lincecum, to testify, over defendant's objections, in substance that about six o'clock on the evening before the wreck Buck Hill stated to Mr. Smith, who was the extra gang foreman of defendant, in the presence of the witness, that he, Smith, was going to cause a hell of a wreck if he didn't spike up those ties. Western Union Tel. Co. v. Wofford, 42 S. W., 119; Railway Co. v. Sherwood, 84 Texas, 136; Gulf, C. & S. F. Ry. Co. v. Southwick, 30 S. W., 592; Railway v. Ivy, 71 Texas, 416; Railway v. Robinson, 73 Texas, 285; Dwyer v. Continental Ins. Co., 63 Texas, 356; Railway v. Hicks, 2 Posey U. C., 437; Treager v. Jackson Coal & M. Co., 142 Ind., 164; 40 N. E., 907; Kirkpatrick v. Briggs, 78 Hun, 518; 29 N. Y. Supp., 532; Kansas Pac. Ry. Co. v. Pointer, 9 Kan., 620; East Tenn. V. & G. R. Co. v. Maloy, 2 S. E., 941; McKinnon v. Norcross, 148 Mass., 533.

The court erred in permitting said witness to testify as to the statement made by Buck Hill, set out in the assignment, if offered for the purpose of impeachment, because the same related to a matter collateral to the issue, and it was improper to permit the witness Smith to be impeached in regard to a fact collateral to the issue. Dimmitt v. Robbins, 74 Texas, 441; Drake v. State, 15 S. W., 725.

The second paragraph of the charge of the court was confusing and misleading to the jury, and exacted a higher degree of care than required by law, in that it instructed the jury to find for the plaintiff, if they believed from the evidence that the derailment of the car was the result of negligence on the part of defendant, or that defendant by the exercise of that high degree of care mentioned in para-

graph one of the charge could have prevented or avoided the derailment of said car. International & G. N. Ry. Co. v. Welch, 86 Texas, 203; Sabine & East Texas Ry. Co. v. Hanks, 79 Texas, 642; Houston & T. C. Ry. Co. v. Keeling, 112 S. W., 808; Chicago, R. I. & T. Ry. Co. v. James, 8 Texas Ct. Rep., 159.

The court erred in the third paragraph of its charge to the jury, which was as follows:

"If you find for plaintiff and allow him damages, you should allow him such sum that, if paid now, would fairly and reasonably compensate him for the injuries sustained, if any; and in estimating his damages, if any, you may take into consideration the mental and physical pain and suffering, if any, he has suffered up to the present time by reason of his injuries, if any, and the reasonable value of time lost, if any, up to the present time consequent upon his injuries, if any; and if you believe from the evidence that his injuries, if any, are permanent, and will diminish his capacity to labor and earn money in the future, or that he will suffer mental and physical pain as a result of said injuries, if any, in the future, then, in addition to the above, you may find such further sum as, if paid now, will be a fair compensation for his diminished capacity, if any, to labor and earn money in the future, if any, and for such mental and physical pain and suffering, if any, as you may believe from the evidence he will suffer in the future as a result of said injuries, if any."

Such charge being erroneous, in that it authorizes a double recovery for any future pain and suffering that plaintiff may sustain on account of his injuries, or for any diminished capacity to labor and earn money in the future, the court having, in the first part of such charge, authorized a recovery in full for present, past and future injuries, and then, in the concluding part of such charge, stated that if the jury believed from the evidence that his injuries, if any, are permanent, and will diminish his capacity to labor and earn money in the future, or that he will suffer mental and physical pain, if any, in the future, "then, in addition to the above, you may find such further sum as, if paid now, will be fair compensation for his diminished capacity, if any, to labor and earn money in the future, if any, and for such mental and physical pain and suffering, if any, as . . . he will suffer in the future as a result of said injuries, if any." Beaumont Traction Co. v. Edge, 19 Texas Ct. Rep., 475; Galveston, H. & S. A. v. Lynch, 55 S. W., 389; Galveston, H. & S. A. Ry. v. Waldo, 32 S. W., 783; Knittle v. Schmidt, 40 S. W., 507; Texas & N. O. v. Kelley, 80 S. W., 1073.

The court erred in permitting the plaintiff to introduce in evidence, over defendant's objection, the following portion of the deposition of his witness, A. F. Mentzer: "For a space of four hundred or five hundred feet back there were a number of such places" (that is, no spikes in the ties), because said testimony was irrelevant and immaterial. Galveston, H. & S. A. Ry. Co. v. Dyer, 46 S. W., 841.

*James Routledge,* for appellee.

JAMES, CHIEF JUSTICE.—This is the second appeal in this cause.

(Norton v. Galveston, H. & S. A. Ry. Co., 108 S. W., 1044.) At a recent trial plaintiff recovered a judgment for $12,500 for personal injuries sustained from the derailment of the train on which he was a passenger, the wreck occurring on the morning of February 22, 1905, about six o'clock, while yet dark, between Sandy Fork and Waelder.

The first and second assignments of error contend, as it was contended on the former appeal, that there was evidence entitling defendant to a submission of the defense that the defect in the track was the work of malicious third persons, committed so immediately before the wreck that no negligence could be ascribed to defendant in respect to it. The court refused to submit the issue.

The facts introduced in evidence by appellant as furnishing a foundation for such issue are substantially as follows:

Defendant's repair gang had the day before worked on the track at this place. Smith, the foreman, testified: "I know the place where the wreck occurred; ten or fifteen minutes before six o'clock on the evening before the wreck occurred in the morning I was over that particular track; the track, on the evening of the 21st of February, the day previous to the wreck, was in good condition. There were two-thirds of the new ties that I was putting in that were spiked; the old ties that remained in the track were also spiked; I didn't disturb the old ties in any way. From my experience in track work, that track was left, on the evening of the 21st of February, in a reasonably safe condition for the operation of passenger trains, consisting of two engines and thirteen cars, some of which were sleepers. It was perfectly safe for the rate of speed of twenty-five or thirty miles an hour.

"I had a pushcar there that I used about trucking ties and tie-plates, and I had used it that day in distributing ties to put in the track, and I put the car off about a couple of rails ahead of where the wreck first started off about six feet, or maybe a little bit more, in the clear. I put it off on the south side of the track in the evening before the wreck happened in the morning. The car would weigh between 750 and 800 pounds. I didn't look for the car next morning, but I found it afterwards down at Buck Branch, down the embankment there. The place where I found it was about four or five hundred or six hundred feet from the wreck; I found it off down the dump there. None of the men had moved the car down there; they did not move it. All of my men went to Sandy Fork with me the evening before the wreck. There were no men other than the men of my gang working there the day previous to the wreck. I left this pushcar the evening previous to the accident right about where this sleeper or baggage car was turned over; I mean the private sleeper; on what we call the south side of the track. I don't remember what time the next day the pushcar was found, but it was quite late in the day when we found it, because we had no use for it at that time, and I was under the impression that there was no need for hunting for the car because I thought the car was either under that baggage car or the sleeper, and later in the day I found the car about four or five hundred feet east of that place, rolled off down the dump, I think about twenty or twenty-five feet from the track, just turned loose and

turned over. Two men could pull the car around and put it on the track, but to handle the car like it ought to be it would take from four to six men to take it up and put it on the track. That car was in my charge and control. I did not give any one permission to use that car that night."

Cross-examined, testified: "I don't remember whether it was in the forenoon or afternoon that I found this pushcar, because I didn't look for it; I thought all the time it was under the sleeper or baggage car, because I knew right where I left the pushcar. It is not a fact that this pushcar was not moved on the night of the wreck but the night previous; it was moved that night of the wreck, because I know just exactly where I left that car. It had not been moved the night previous that I know of; I know that it was not moved on the night of the 20th, but on the night of the 21st it was moved."

Harris, the engineer on the head engine of the wrecked train, testified that there were two engines, he being on the lead engine; that he was running about twenty-five miles an hour; that when he came near this place he noticed that the track was what they called badly out of line—the track was not straight, but kinked. There was a sort of elbow in the track—quite a kink; he supposed when he first discovered this it was about fifty feet ahead of him. He made every effort to stop as soon as possible because it was a bad place, and he didn't think that at a high rate of speed it was a good place to go over—it was calculated to derail the train. He did not remember how much kink it was; it was pretty badly out of line, though he didn't know how many inches. When asked if one or both rails were out of line he stated that it seemed to him the entire track was moved to the side. The engine he was running did not leave the track; "the second engine you might say did not leave the track, although it was badly tipped over, and I believe the tender of the second engine was derailed and two baggage cars, I think, and I believe a private car that was next to them, and I think three coaches." He stated also that the track was badly torn up and he didn't think that after the wreck you could have told anything about the previous condition of the track.

Ragsdale testified that he was acquainted with the track at this place; that as engineer of a freight train he went over it, going west about an hour ahead of the train that was wrecked, and didn't observe any kink in the track, though he couldn't say that his attention was right on the rail, as he was keeping a lookout ahead. He did not observe anything of the kind; the track appeared in good condition, about the same as all tracks would be. He was going over this place at fifteen or twenty miles an hour, and had one engine.

Simpson, who was the conductor on Ragsdale's train, stated when he passed over this track about three o'clock a. m. (which made it about three hours prior to the wreck) he was on the platform of the caboose and didn't observe anything wrong with the track. "There was not to my knowledge a kink in the track sufficient to cause the derailment or wreck of the train. If it had been there bad enough to derail a train, I ought to have observed it. I didn't notice anything there when I passed over it to indicate such thing on the track. . . .

I can't recollect whether I looked back or not, but I didn't pay any attention to it, looking at it; we generally feel these places, usually low places, or kink or sink, whatever you call it. We generally feel it sitting in the caboose, and I didn't observe anything unusual there more than any other place on the road. I was not standing there leaning over looking down at the track, and didn't have any head-light in the rear end. The only light I had was a white hand-light; can't say whether I had it in my hand or standing down by the side of me, but it was close around; it was a moonlight night, but hazy. I was not taking any particular observation of the track, but I am a right close observer about that, and I could feel it. I was not looking at the track particularly, but if I had felt any different motion of the train then I would have looked. I couldn't see the track minutely. . . . I was not specially observing the track, but if I had felt any particular motion I would have looked at the track closely; that is all there is about it. I expect we were going twelve or fifteen miles an hour; we were killing time. Going at that slow rate of speed, I would be likely to feel anything if in that condition to throw the train off the track."

Smith testified also that he was engaged in putting in new ties and putting tie plates on. He stated: "A tie plate is about a quarter of an inch thick, about five inches wide and from seven to seven and a half inches long. It fits on the top of the tie, it has grooves that imbed themselves in the tie, and has a hole in each side to drive the spike in the same width as the rail. This tie plate is put on every other tie. The purpose of a tie plate is to keep the rail from cutting into the ties and to keep the rails from spreading. It is to protect the tie and to keep the rails from spreading. . . . This track had not been tie-plated." It thus appears from his testimony that only a part of the new ties he put in were spiked and no tie plates were put on, and the track was not left in a condition that would prevent spreading of the rails.

The said witness Simpson testified further: "If the track is not properly spiked a train passing over it might have a tendency to cause the track to get out of line, and the more trains that run over a defective piece of track the more tendency is to throw it out of line to a certain extent. These trains have a weight of many tons, and of course, when in motion, they exert great weight upon the rails. If the track is out of line the effect of trains passing over it, if going at any rate of speed, is to throw it further out of line, and it could occur that one train going over the track when defective may throw it out of line and go over safely and the next train be derailed."

The said witness Ragsdale testified also: "If the track wasn't properly tight and wasn't in proper condition a heavily-loaded oil car would be more likely to injure the track than a lightly-loaded freight car. I should think if the rails were not properly spiked that engines going over the track would tend to loosen the track further. Trains and coaches going over a track do have some effect in loosening them. Because of that fact they have section men to keep tightening up the bolts. The action of trains on a track has a tendency to loosen it and wear it, and if not properly spiked and tightened up, I should judge

they would have a greater tendency to loosen it. If the track did loosen and several trains pass over, I should judge the passing of trains will loosen the track until possibly the rails may spread; I should judge they would. . . . If the hind end should spread the rails then the train behind would go off."

The evidence was that several trains passed over this place that night. The one that Ragsdale and Simpson were on, and which had shortly before passed, was a loaded oil train, one which Ragsdale said was the most calculated to injure a defective track.

We should·not here refer to the weight of the evidence tending to show the probability of the track having been put out of line by use, because the question raised by the assignment under consideration does not depend on the weight of the evidence, but upon the presence of evidence to have entitled appellant to a submission of the particular issue. As briefed, the matter rests upon the testimony of the said witnesses, Harris, Smith, Ragsdale and Simpson.

There was no evidence whatever of any marks or signs on the track, or near there, indicating the work of trespassers, except the fact that the pushcar that Smith had left at a certain place the evening before was the next day found moved several hundred feet away from where he had left it. Had that condition of things been observed at or about the time of the wreck, or before, it might have been claimed that it showed some persons had been there during the night bent on mischief. But Smith says: "I don't remember what time the next day the pushcar was found, but it was quite late in the day when we found it, because we had no use for it at the time and I was under the impression that there was no need of hunting for the car because I thought it was either under the baggage car or the sleeper, and later in the day I found the car four or five hundred feet east of that place rolled down the dump, I think about twenty or thirty feet from the track, just turned loose and turned over." Although he testified that none of his men moved it, it was an uncontroverted fact that his crew was only a part of the force at work that morning repairing the wreck.

There being nothing to show when the pushcar was removed, the jury would not have been able to find that it was removed prior to the wreck, and not after the wreck, consequently as a fact or circumstance going to show the presence of mischievous persons at that place during the night, it was wholly without probative effect. This leaves nothing in the case upon which to base a finding that the condition of the track was due to trespassers, except the fact that the engineer perceived the kink in the track, and an hour or so before an oil train had passed over safely without anything in the movement of the train to apprise its conductor and engineer that anything was wrong with the track. From this the jury was expected to find that the track was left by the oil train in safe condition and the kink was due to some outside interference within the hour.

We think it might be possible to make the issue in that manner, by proof that an hour before an accident of this kind the track was left by the last preceding train in safe condition. If the jury should be able to find that the track was so left in a sound and safe condi-

tion, and an hour later a rail was found displaced, it would be reasonable to say that some outside agency had produced this. But where is the proof that the track was not left with this kink in it when the oil train passed over? There is none. On the contrary, the proof was that the natural tendency was to leave the imperfectly-spiked track out of line. That trespassers did the work might be the subject of conjecture, but in our opinion enough was not shown to raise or sustain the affirmative of the issue, and the assignments are overruled.

The third and fourth assignments should be considered together. Third assignment: "The court erred in permitting the plaintiff's witness, C. C. Lincecum, to testify over defendant's objections in substance that about six o'clock on the evening before the wreck Buck Hill stated to Mr. Smith, who was the extra gang foreman of defendant, in the presence of the witness, that he, Smith, was going to cause a hell of a wreck of he didn't spike up those ties." Fourth assignment: "The court erred in permitting the plaintiff's witness, C. C. Lincecum, to testify in substance over defendant's objections that Smith said, in response to the statement of Buck Hill, that that was the way he had instructions to spike them."

Smith had testified that when he quit work the evening before he had left the track in a reasonably safe condition for the operation of passenger trains consisting of two engines and thirteen cars, some of which were sleepers, and that it was perfectly safe for the rate of speed of twenty-five or thirty miles an hour. Two-thirds of the ties spiked to the rails was perfectly safe, more than safe. "There were two-thirds of the new ties that I was putting in that were spiked. I intended to go back in a day of two and put in the tie plates, but I left it in a perfectly safe condition for trains." Any statement or admission of Smith to the effect that the track as he left it was not safe for trains could be shown to discredit his testimony on this matter, it not being an immaterial or collateral matter, but a matter in issue. The answer he is said to have made to the statement addressed to him by Buck Hill implied that he agreed with Buck Hill. At least it was susceptible of being so understood. If his response was proper evidence, it is clearly immaterial who propounded the inquiry or made the statement which evoked it. The statement that Buck Hill made, which Smith replied to, was admissible to show the connection, subject matter and meaning of Smith's reply.

As predicate for this impeaching or discrediting testimony it appears that Smith had testified that on the evening of the 21st he did not see Buck Hill at all. Then he was asked: "Didn't Buck Hill tell you in the presence of C. C. Lincecum, on the evening of the 21st, about quitting time, that if you left that track in the condition you left it you were going to have a serious wreck?" Answer: "No, sir." Question: "And your answer to him was that you had got orders to spike it about one tie in four, and you were going to follow instructions?" Answer: "No, sir; there was no such conversation with Buck Hill or anyone else."

Now, the question put to Lincecum did not embody the precise question that had been put to and answered by Smith. The question was: "I wish to ask you whether or not on that occasion, in your

presence, Buck Hill stated to Mr. Smith, or did not state to him, that if he, Smith, did not spike those ties he would cause a wreck there." Whatever merit there might have been in this point was abandoned. The bill of exceptions shows that defendant's counsel at first objected on this ground, and the court required counsel for plaintiff to confine himself to the specific question propounded to the witness. To this counsel for plaintiff assented, and then framed and propounded the question to Lincecum as it is above set forth. To this counsel for defendant did not object upon the ground that it did not embody the precise question, but made objection as follows: "We object to that for the reasons heretofore stated. The statements have to be hearsay so far as this defendant is concerned, made by an outsider; it is not shown that Buck Hill had any connection whatever with this defendant, in any capacity, and any statements made by him are hearsay as to this defendant, not binding upon it, irrelevant and immaterial." Evidently counsel for defendant considered the question, as finally framed, as sufficient in said respect. We may add that we are not sure the answer of Smith was not admissible as evidence that the track at the stage it had then reached was in a condition liable to cause a wreck. We think it was.

Smith had charge of this work for defendant and it was in course of being performed. He testified that it was not finished and that the tie plates had yet to be put on. Admissions made by the agent under these circumstances in reference to the work the agent was performing has been held to be substantive evidence against the master. (City of Austin v. Forbis, 99 Texas, 234.) The answer of Smith standing alone would have signified nothing as regards the safety of the track, but taken in connection with the remark of Hill it had a meaning which could be taken as an implied admission, and was substantive evidence against defendant that the track was not safe for trains, and what it implied was a question for the jury. See also Cooper v. Daniels, 96 S. W., 1100.

The fifth assignment complains of this paragraph of the charge: "If you believe from the evidence that on or about February 22, 1905, when the plaintiff was a passenger on one of the cars in a train operated by the defendant, and that while plaintiff was riding in said car, the said car became derailed between Sandy Fork and Waelder, Texas, and that by reason thereof plaintiff was thrown about in and against said car, and in consequence thereof plaintiff was injured in the manner that you find from the evidence he was injured—if you so find—and that the derailment of said car was the result of negligence on the part of the said defendant, or that the defendant by the exercise of that high degree of care mentioned in paragraph one of this charge could have prevented or avoided the derailment of said car, and that such negligence, if any, was the proximate cause of the injuries, if any, to plaintiff, then you are instructed that your verdict must be for the plaintiff; but unless you do so find, your verdict must be for the defendant."

This charge is claimed to be confusing in that the jury were told to find for plaintiff if they believed from the evidence that the derailment was the result of negligence on the part of defendant, or that

defendant by the exercise of that high degree of care mentioned in paragraph one of the charge *could* have prevented or avoided it. Paragraph one was: "You are instructed that it is the duty of the defendant to exercise the highest degree of care that would be used by very prudent persons under the same or similar circumstances to avoid and prevent injury to passengers upon its cars, and that a failure to exercise such high degree of care constitutes negligence as used in this charge." The rule thus expressed is firmly settled in our decisions, and it is not questioned by any assignment of error in this case. It is true the paragraph complained of would have been sufficient if it had omitted the latter part, inasmuch as the court had already informed the jury what it meant by the word negligence as used in the charge. We can see nothing confusing in the addition of the latter part of the charge, which the jury must have understood to be merely an explanation of what constituted negligence for the purposes of this case. The use of the word "could" was not an error. (Heyde v. St. Louis Transit Co., 77 S. W., 127.)

The sixth assignment complains of the charge on the measure of damages, which we find did not authorize double damages.

The seventh complains of this testimony of J. R. Norton: "My opinion is that the wreck was caused from the tracks spreading at the point where the wrecked cars came to a standstill, where the sleeper and dining cars were halfway over it, the track spreading, because it was not sufficiently spiked to hold it together," because it was an opinion or conclusion of Norton, who was not shown to be qualified as an expert. The testimony was an opinion, and the only question which this assignment raises is that Norton was not shown to be an expert. We find that he was sufficiently shown to be such by the evidence.

The eighth assignment complains of the following testimony of A. F. Mentzer: "For a space of four hundred or five hundred feet back there were a number of such places (that is, no spikes in the ties)," because irrelevant and immaterial. We find that this matter can not be treated as material error, if error at all, for the reason that like testimony was admitted without objection.

The tenth assignment, complaining of the overruling of a motion for new trial in that the overwhelming weight of the evidence showed that there had been no negligence on the part of defendant, and that the wreck was due to malicious third persons, is overruled.

The ninth complains of the overruling of the motion for new trial, because of excessive verdict. We find that the jury may properly have taken a view of the testimony which would warrant their verdict, and the circumstances would not warrant us in substituting our impressions for theirs. Affirmed.

*Affirmed.*

Writ of error refused.